Filed 2/24/22  Stillwater Liquidating v. Chernyakova CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| STILLWATER LIQUIDATING, LLC, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> YEVGENIYA CHERNYAKOVA, as Administrator, etc., et al., <br><br> Defendants and Respondents. | B309432 <br><br> Los Angeles County Super. Ct. No. BC702295 |

APPEAL from a judgment of the Superior Court of Los Angeles County, Carolyn B. Kuhl, Judge. Affirmed in part, reversed in part with directions.

Foley & Lardner, Tony Tootell, Jessica N. Walker, and David B. Goroff for Plaintiff and Appellant.

Mintz Levin Cohn Ferris Glovsky & Popeo, Joseph R. Dunn, Abigail V. O'Brient, and Evan S. Nadel for Defendants and Respondents.

# INTRODUCTION

Plaintiff Stillwater Liquidating, LLC (Stillwater) is a fiduciary that was formed to pursue claims on behalf of a financial company and a group of investment funds. Stillwater sued Yevgeniya Chernyakova, who is the administrator of the estate of Mark Buntzman, and several entities that Buntzman owned and controlled during his life. Stillwater alleged Buntzman and his entities received, through fraudulent transfers, title to several parcels of real property and the proceeds from the sale of one parcel of real property, all of which once belonged to the financial company's and the investment funds' debtors.

The trial court sustained the defendants' demurrer to the operative first amended complaint, finding, among other things, that several of Stillwater's fraudulent transfer claims were time-barred and that, in any event, Stillwater failed to allege any of the subject properties were transferred by one of the investment funds' or the financial company's debtors to one of the defendants in this case. The court granted Stillwater leave to amend some of its claims. After Stillwater elected not to file an amended complaint, the court entered judgment dismissing the lawsuit. This appeal followed.

This is a complicated case involving several parcels of property and numerous transfers of those parcels. Even more numerous is the number of individuals and entities purportedly involved in making those transfers. Adding to that complexity, Stillwater's operative first amended complaint is more than 60 pages long, asserts 18 separate causes of action, and is accompanied by nearly 1,000 pages of exhibits. The pleading,

however, does anything but paint an intelligible picture of the numerous transfers underlying Stillwater's claims.

Nor does Stillwater's opening brief on appeal provide much help untangling the first amended complaint's allegations. For the most part, the opening brief lacks cogent analysis explaining how Stillwater pled or can plead its claims, and it includes numerous factual assertions that are not supported by citations to the more-than 4,000-page appellate record.[1]

While we conclude Stillwater has shown it can amend its complaint to plead additional facts establishing one of its actual fraudulent transfer claims and several common law claims arising out of the same transferred property, it has not met its burden to demonstrate error as to the remaining claims asserted in the first amended complaint. We therefore reverse the judgment in part and remand the matter for further proceedings consistent with this opinion.

## FACTUAL BACKGROUND

Stillwater is a fiduciary acting on behalf of a group of 12 investment funds (Funds) and Gerova Financial Group (Gerova).

---

[1] The difficulty presented by Stillwater's failure to cite to page numbers in the record is heightened in this case where the appellant's appendix spans 11 volumes with more than 3,000 pages, the respondents' appendix is more than 1,000 pages, and the reporter's transcript is more than 100 pages. (See *Myers v. Trendwest Resorts, Inc.* (2009) 178 Cal.App.4th 735, 745 [" 'We are a busy court which "cannot be expected to search through a voluminous record to discover evidence on a point raised by [a party] when his brief makes no reference to the pages where the evidence on the point can be found in the record." ' "].)

The Funds had owned interests in hundreds of parcels of real property worth more than $540 million.

In December 2009, one of the funds (Offshore Fund) and Gerova entered into an asset purchase agreement, through which the Offshore Fund agreed to transfer its property interests to one of Gerova's subsidiaries. Several days later, another one of the funds (Onshore Fund) merged with a different subsidiary of Gerova.

In May 2010, Gerova and Planet Five Development Group LLC (Planet Five), a Florida real estate development company owned by Paul Rohan, agreed to form a joint venture called "Net Five Holdings, LLC" (Net Five Holdings or joint venture). Net Five Holdings' owners included, among others, Gerova and Planet Five. Rohan served as Net Five Holdings' manager.

Under Net Five Holdings' operating agreement (Operating Agreement), Gerova was supposed to receive a 49 percent interest in the joint venture in exchange for $4,900 plus the appraised net asset value of Gerova's real estate portfolio. Planet Five agreed to contribute $3,900 plus 10 real estate properties in exchange for a 39 percent interest in Net Five Holdings.[2] As we discuss below,

___

[2] According to the Operating Agreement, Planet Five agreed to contribute the following properties to Net Five Holdings: (1) Sabal Retail, 510 Hwy 466, Lady Lake, Florida 32159; (2) Sabal Storage, 520 Hwy 466, Lady Lake, Florida 32159; (3) Santa FE Medical, 8564 E Cr 466, The Villages, Florida 32162; (4) Santa Fe Crossing, 8600 CR 466, The Villages, Florida 32162; (5) Dana, 11950 CR 101, The Villages, Florida 32162; (6) Palm Ridge, 11962 CR 101, The Villages, Florida 32162; (7) Lauren, 11974, CR 101, The Villages, Florida 32162; (8) Savannah Oaks, 439 CR 466A, Fruitland Park, Florida 34731; (9) Village Park Center (Steinmetz), 11725 NE 63rd Drive, The Villages,

several of the properties pledged by Planet Five form the basis for this lawsuit.

Section 2.3(c) of the Operating Agreement provided that "Title to assets, whether real, personal or mixed, tangible or intangible, shall be deemed to be owned by [Net Five Holdings], and no Member, individually or collectively, shall have any ownership interest in such assets or any portion thereof. Title to any or all of the assets shall be recorded as property of the Company on the books and records of the Company, irrespective of the name in which legal title to such assets is held." According to judicially noticed title records, title to only one of the properties Planet Five pledged to commit was ever formally transferred to Net Five Holdings.

In early 2011, news outlets reported that Gerova was operating a fraudulent investment scheme. Later that year, some of the Funds' investors filed class action lawsuits against Gerova, Net Five Holdings, Rohan, and other defendants in federal court in New York, alleging violations of securities laws and breaches of fiduciary duties. Two of Gerova's representatives were later convicted of operating a stock manipulation scheme.

In October 2011, Gerova initiated wind-up proceedings in Bermuda. In July 2012, a federal court in New York enjoined " 'Net Five and its subsidiaries' " from selling, transferring, or pledging, without first notifying the class action plaintiffs, " 'any assets they own or control' " valued at $50,000 or higher to any related persons, including officers and directors of Net Five Holdings, Planet Five, and any entity controlled by either of

Florida 32162; and (10) The Port Authority, 39.98 (acres) Hecksher Drive, Jacksonville, Florida, 32226.

those companies. In October 2012, an involuntary bankruptcy action was initiated against the Offshore Fund.

In early 2014, Stillwater was formed as part of a settlement agreement resolving the class action lawsuits and other disputes. Stillwater was assigned all claims belonging to the Funds, including claims belonging to Gerova concerning assets formerly owned by the Funds.

In October 2014, Stillwater initiated an adversary proceeding in bankruptcy court in New York against Rohan, Net Five Holdings, Planet Five, and numerous other entities and individuals, asserting 16 causes of action, including claims for conversion, conspiracy to defraud, and breach of contract (Adversary Proceeding). Several months later, the bankruptcy court issued a preliminary injunction prohibiting the defendants in the Adversary Proceeding from "selling, transferring, pledging or hypothecating any assets formerly belonging to or which can be traced to assets formerly belonging to, the [Funds] … ."

In September 2016, the bankruptcy court in the Adversary Proceeding dismissed Stillwater's claims against most of the defendants, leaving only Stillwater's claims against Net Five Holdings, Planet Five, Rohan, and several separate purpose entities owned by Net Five Holdings. In its ruling, the bankruptcy court admonished Stillwater for its pleading practices: "These claims sound straightforward, but they are not. The original Complaint was eighty-one pages long. The Court directed that clarifying amendments be made, which led to the filing of a thirty-four page Supplement with 949 pages of exhibits. An Amended Complaint made further changes and is 124 pages long, with 112 pages of its own exhibits. The hope was that the amendments would provide clarity, particularly as to the alleged

6

fraudulent transfers. Instead, Stillwater Liquidating has stubbornly mischaracterized transactions, conflated parties and events, and tried to gloss over important details about the assets that were transferred and the nature of the Stillwater Funds' property interests. As a result[,] the lengthy pleadings are packed with plain errors, contradictions and poorly perceived claims."

## PROCEDURAL BACKGROUND

### 1.    The Original Complaint

In May 2018, several weeks after the federal district court affirmed the bankruptcy court's dismissal ruling in the Adversary Proceeding, Stillwater filed this lawsuit against Buntzman[3] and the following entities controlled and owned by him: Degma Investing, LLC (Degma), G.M.A. Industrial Corp. (GMA), The Parking Mall, LLC (Parking Mall), LTAP1, LLC (LTAP), and SDC Remainder LLC (SDC Remainder).[4] The original complaint asserted seven causes of action: unjust enrichment, conversion, civil conspiracy, conspiracy to defraud, aiding and abetting conspiracy, constructive trust, and subsequent fraudulent transfer under the Uniform Voidable Transfers Act (Act) (Civ. Code,[5] § 3439 et seq.).

Stillwater claimed that Rohan and Buntzman were long-time business partners who concocted a fraudulent scheme to

---

[3] Buntzman died after this lawsuit was filed. In January 2019, the parties filed a stipulation to substitute Chernyakova, as administrator of Buntzman's estate, as a defendant.

[4] We collectively refer to the defendants in this case as the "Buntzman Defendants."

[5] All undesignated statutory references are to the Civil Code.

7

strip Net Five Holdings of its assets. Rohan then began transferring some of the assets that Planet Five had pledged to contribute to Net Five Holdings into single purpose entities he had created. Once the Funds and Gerova entered bankruptcy, Rohan used the single purpose entities to transfer to Buntzman and his entities assets that Stillwater claimed belonged to Net Five Holdings, including several of the properties Planet Five pledged to contribute to the joint venture.

Stillwater also claimed the Offshore and Onshore Funds' transfers of assets to Gerova were fraudulent. According to Stillwater, Net Five Holdings was formed so that Gerova and Planet Five could funnel their assets, including those obtained from the Funds, to a company outside the reach of Gerova's and the Funds' creditors.

The Buntzman Defendants demurred to the original complaint.

In its opposition, Stillwater abandoned its theory that the funds' transfer of assets to Gerova was fraudulent. Instead, Stillwater asked the court to interpret its claim for subsequent fraudulent transfer as a claim for initial fraudulent transfer under a theory that Rohan transferred assets out of Net Five Holdings and to the Buntzman Defendants. Specifically, Stillwater asserted that the gravamen of its lawsuit arose out of "the post-bankruptcy conduct by Defendants in assisting Rohan stripping Net Five [Holdings] assets to render it judgment proof while Defendants received a windfall from the improperly diverted assets." In another part of its opposition, Stillwater reiterated that its claims arose out of the Buntzman Defendants' "actions in concert with Rohan in stripping the assets to render Net Five [Holdings] judgment proof during litigation and while

8

insolvent. It is incontrovertible that [Stillwater] is the [p]laintiff in [the] pending [Adversary Proceeding], which was pending at the time of the transfers to" the Buntzman Defendants.

The court sustained the demurrer to the original complaint with leave to amend as to all of Stillwater's claims, except for the claim for conversion, which the court sustained without leave to amend. Relying on the representations Stillwater made in opposing the demurrer, the court concluded Stillwater had standing to pursue a fraudulent transfer claim under a theory that the Buntzman Defendants "knowingly assisted Rohan in rendering Net Five [Holdings] judgment proof while [Stillwater] pursued actionable claims against Net Five [Holdings] in bankruptcy court." Nevertheless, the court found Stillwater's fraudulent transfer claim was "fatally uncertain" as pleaded in the original complaint.

As the court explained, Stillwater failed to identify with sufficient particularity any of the properties that Rohan and the entities related to Net Five Holdings allegedly transferred to the Buntzman Defendants. Instead, Stillwater used only " 'shorthand' " names for the properties. And, as to some of the properties, Stillwater failed to allege that they were ever transferred by Rohan or one of the Adversary Proceeding defendants related to Net Five Holdings to one of the Buntzman Defendants.

The court granted Stillwater leave to amend its fraudulent transfer claim with directions to plead "each element of the fraudulent transfer allegations" with "specificity as to each property and as to each Defendant's alleged involvement in the transfer." The court also directed Stillwater to clearly identify the properties at issue and to clarify that it pursues fraudulent

9

transfer claims based solely on transfers of property interests from Rohan, Net Five Holdings, or one of the related entities named as a defendant in the Adversary Proceeding to one of the Buntzman Defendants, with the intent to render the transferors judgment-proof in light of litigation brought by Stillwater against them in federal court.

As for Stillwater's remaining causes of action for unjust enrichment, civil conspiracy, aiding and abetting conspiracy, and constructive trust, the court found they were all dependent on Stillwater's fraudulent transfer claim.

## 2. The First Amended Complaint

In September 2019, Stillwater filed the operative first amended complaint. The amended pleading asserts 18 causes of action, is 62 pages long, and is accompanied by nearly 1,000 pages of exhibits. Stillwater restyled its fraudulent transfer claim as 12 separate causes of action for violations of the Act. Specifically, Stillwater asserted a claim for actual fraudulent transfer (§ 3439.04, subd. (a)(1)) and a claim for constructive fraudulent transfer (§§ 3439.04, subd. (a)(2), 3439.05) as to each of the six properties or sets of properties Stillwater claims the Buntzman Defendants obtained, through fraud, from Rohan, Net Five Holdings, or one of the entities related to Net Five Holdings and Rohan (Counts 1 through 12). Stillwater also asserted claims for unjust enrichment (Count 13), civil conspiracy (Count 14), conspiracy to defraud (Count 15), aiding and abetting conspiracy (Count 16), aiding and abetting breach of fiduciary duty (Count 17), and constructive trust (Count 18). We summarize the allegations concerning the first 12 causes of action by reference to the properties they are based on.

10

### 2.1. Savannah Oaks Property

Counts 1 and 2 arise out of allegedly fraudulent transfers of what Stillwater calls the "Savannah Oaks" property. The first amended complaint doesn't provide a clear description of the property, but it apparently consists of two sets of parcels located in Lake County, Florida. The Savannah Oaks property was one of the 10 properties that Planet Five pledged to contribute to Net Five Holdings. Stillwater alleged that, by virtue of Section 2.3(c) of the Operating Agreement, Net Five Holdings became the owner of the entire Savannah Oaks property in May 2010, when the joint venture was formed.

Nevertheless, in October 2013, Net Five at Savannah Oaks, LLC, an entity separately owned by Rohan and which was not named as a defendant in the Adversary Proceeding, transferred the first set of Savannah Oaks parcels to GMA, one of the Buntzman Defendants. Net Five at Savannah Oaks received $1,250,000 in exchange for the property, none of which went to Net Five Holdings. After the transfer, Degma, another of the Buntzman Defendants, held itself out as one of the owners of the property.

As for the second set of Savannah Oaks parcels, Stillwater alleged that in early December 2013, a company called "PMJ Capital Corp." (PMJ) transferred the property to Development Property Holdings, a company controlled by Rohan but which was not named as a defendant in the Adversary Proceeding. In June 2015, Development Property Holdings transferred the property to GMA. Net Five Holdings received no consideration for the sale of the second set of Savannah Oaks parcels.

### 2.2. Sabal Storage Property

Counts 3 and 4 pertain to a "Sabal Storage" property, located in Lady Lake, Florida, which Planet Five pledged to commit to Net Five Holdings. Stillwater claimed Net Five Holdings became the owner of the Sabal Storage property once the joint venture was formed in May 2010, via the terms of the Operating Agreement.

In November 2013, Sabal Palm Ventures, LLC, an entity owned by Rohan but that was not named as a defendant in the Adversary Proceeding, transferred the Sabal Storage property to Buntzman Defendants GMA and SDC, with each entity receiving a 50 percent interest in the property. In February 2015, SDC and GMA transferred the Sabal Storage property to Lady L Storage 18 (FL), LLC for over $6 million. Net Five Holdings received none of the proceeds from either transfer.

### 2.3. Calhoun Proceeds

Counts 5 and 6 concern proceeds from the sale of a set of parcels called the Calhoun Property, located in Georgia. Like the properties discussed above, Stillwater claimed Net Five Holdings became the owner of the Calhoun Property in May 2010 because it was one of the properties Planet Five pledged to contribute to the joint venture when it was formed.

In December 2011, Rohan "caused" Net Five Holdings to give Degma, a Buntzman Defendant, a deed to secure debt against one of the six parcels comprising the Calhoun Property. In exchange, Rohan received a $125,000 personal loan. In December 2013, Rohan "caused" Net Five Holdings to sell the parcel securing the loan issued by Degma and Buntzman. Rohan used the proceeds from the sale to repay his personal loan.

Stillwater claims Rohan transferred the proceeds to Degma and Buntzman to render Net Five Holdings judgment-proof.

### 2.4. Village Park Tract F

Counts 7 and 8 concern a parcel of property called Village Park Tract F (Tract F), located in The Villages, Florida. Tract F is connected to another set of properties that forms the basis for Counts 11 and 12. Stillwater claimed Net Five Holdings became the owner of Tract F via the Operating Agreement because Planet Five pledged to contribute the property to the joint venture when it was formed.

Buntzman held GMA out as Tract F's owner and attempted to negotiate various sales of the property on GMA's behalf. However, Stillwater did not allege when or through which transfer GMA obtained the property, stating "[h]ow the property went from [Net Five Holdings] to GMA is unclear but the fact that it did appears clear." Indeed, Stillwater acknowledged that title records don't show GMA, Buntzman, or any of his other entities ever owned the property. Instead, the pleading identifies L&N Land Investments, LLC (L&N), a company that is not related to Rohan, Rohan's entities, Buntzman, or Buntzman's entities, as the owner of the Tract F property.

### 2.5. The Port Property

Counts 9 and 10 concern two parcels of property, collectively known as the Port Property, located at 3372 and 3379 Zoo Parkway in Jacksonville, Florida. Like the other properties at issue in this lawsuit, Stillwater claimed Planet Five transferred the Port Property to Net Five Holdings via the Operating Agreement.

13

In one part of the first amended complaint, Stillwater acknowledged it was unclear whether the Port Property was ever transferred. Instead, Stillwater asserted only that Buntzman and the Parking Mall held themselves out as the owners of the property while discussing potential development plans with several individuals, including Rohan. Indeed, Stillwater acknowledged that as of Spring 2017, Jaxport Holdings LLC, a company not owned by Rohan or Buntzman, owned one of the Port Property parcels.

### 2.6. The Steinmetz Property

Counts 11 and 12 arise out of the Steinmetz Property, which consists of several parcels connected to Tract F. According to Stillwater, Planet Five transferred the property to Net Five Holdings in May 2010, by virtue of the Operating Agreement.

Stillwater claimed that "[t]itle records do not reflect commercial realities" because neither Planet Five nor Net Five Holdings appears in the property's chain of title. Instead, at the time Net Five Holdings was formed, title records showed the property was owned by Eagle FL 1 SPE LLC (Eagle), which had acquired the property from Lady Lake Hospitality and an individual named Nancy Steinmetz through judicial foreclosure in April 2010. In December 2010, Eagle transferred the property to Lady Lake Hotel, LLC, which still appears as the current owner.

Despite what title records show, Stillwater claimed other records (which it does not identify) show the property was owned by L&N as of 2014 or 2015, which later sold the property to an unidentified joint venture between Rohan and Buntzman. But, only a few paragraphs later in the first amended complaint, Stillwater claimed L&N sold the property in August 2014 to

14

another individual for use in a joint venture he intended to create. In November 2014, one of Rohan's entities entered into a "development agreement" with that individual to develop the Steinmetz property. Rohan and Buntzman then tried to negotiate various development plans for the property, but Stillwater never claims those plans were finalized.

### 3. The Demurrer to the First Amended Complaint

The Buntzman Defendants demurred to the first amended complaint. They argued Stillwater couldn't state claims for actual or constructive fraudulent transfer in Counts 1 through 12 because the assets giving rise to Stillwater's lawsuit were either never transferred by one of the defendants named in the Adversary Proceeding or were never transferred to one of the defendants named in this lawsuit. Alternatively, the Buntzman Defendants argued all of Stillwater's fraudulent transfer claims were barred by the statute of limitations for fraudulent transfer claims brought under the Act (§ 3439.09).

As for Stillwater's claims for unjust enrichment (Count 13), civil conspiracy (Count 14), and conspiracy to defraud (Count 15), the Buntzman Defendants argued they all failed because those claims were entirely dependent on Stillwater's fraudulent transfer claims. The Buntzman Defendants also asserted Stillwater couldn't state a claim for aiding and abetting a conspiracy (Count 16) because no such cause of action exists in California and that Stillwater was prohibited from adding a new claim for aiding and abetting breach of fiduciary duty (Count 17) because it exceeded the scope of the court's ruling on the original demurrer. Finally, the Buntzman Defendants argued Stillwater failed to state a claim for constructive trust (Count 18) because

15

Stillwater never had a right to possess any of the property giving rise to the fraudulent transfer claims.

In support of their demurrer, the Buntzman Defendants filed two unopposed requests for judicial notice of, among other things, numerous title records and grant deeds concerning the properties at issue in Stillwater's first amended complaint and various records from the Adversary Proceeding and the class action lawsuits against Gerova and Net Five Holdings. The title records showed that, aside from the Calhoun property, Net Five Holdings never received title to any of the properties and that none of the properties were ever transferred by a defendant named in the Adversary Proceeding.

Stillwater opposed the demurrer to the first amended complaint. In support of its opposition, Stillwater filed a request for judicial notice of numerous documents, including title records pertaining to several of the properties at issue in the first amended complaint.

The court issued a 23-page written ruling. The court granted the Buntzman Defendants' requests for judicial notice in their entirety, and it granted Stillwater's request in part, taking judicial notice of, among other things, the included title records.

As a preliminary matter, the court found Counts 1 through 6 (fraudulent transfers of the Savannah Oaks, Sabal Storage, and Calhoun Proceeds, respectively) appeared to be time barred under section 3439.09, concluding all the transfers to the various Buntzman Defendants were alleged to have been made more than four years before Stillwater filed this lawsuit. The court, however, overruled the demurrer as to Counts 1 and 3 on statute of limitations grounds because Stillwater could show at trial that it did not discover the fraudulent nature of the underlying

16

transfers until less than a year before it filed this lawsuit (§ 3439.09, subd. (a)). As for Count 5, the court sustained the demurrer but granted Stillwater leave to amend to plead facts showing it did not discover the fraudulent nature of the underlying transfers until less than a year before it filed this lawsuit (§ 3439.09, subd. (a)). The court denied Stillwater leave to amend its constructive fraudulent transfer claims asserted in Counts 2, 4, and 6.

But the court sustained the demurrer without leave to amend as to all of Stillwater's fraudulent transfer claims, except Count 5, on alternative grounds. In this part of its ruling, the court rejected Stillwater's assertions that Net Five Holdings owned all of the property at issue in Counts 1 through 12 by virtue of Section 2.3(c) of the joint venture's Operating Agreement, which purported to vest Net Five Holdings with ownership of all the property its founding members pledged to contribute to the joint venture.

For Counts 1 and 2 (the Savannah Oaks Property) and Counts 3 and 4 (the Sabal Storage Property), the court found Stillwater could not state claims for actual or constructive fraudulent transfer because Stillwater never alleged the properties were transferred by Net Five Holdings or one of the other defendants named in the Adversary Proceeding.

The court sustained the demurrer with leave to amend as to Count 5—i.e., actual fraudulent transfer of the Calhoun Proceeds. The court directed Stillwater to "more accurately plead" that the transfer of the proceeds from the sale of the Calhoun Property from Net Five Holdings to Buntzman or Degma "was meant to render [Net Five Holdings] judgment proof in light of the ongoing or threatened litigation by [Stillwater]."

17

As for Counts 7 and 8 (Tract F), the court found Stillwater's allegations were "so uncertain" and contradictory that it was "impossible to determine the identities of the transferor and transferee, … the date of the transfer[,]" or the identity of the "property itself." In other words, the court found Stillwater failed to allege how the property was transferred by Net Five Holdings or one of the defendants in the Adversary Proceeding to one of the Buntzman Defendants.

Likewise, with respect to Counts 9 and 10 (the Port Property), the court found the claims were fatally uncertain because Stillwater failed to "actually plead when the transfer of the Port Property took place or the identities of the transferor and transferee." The court explained that while Stillwater acknowledged in its pleading that it was uncertain when, if ever, the Port Property was transferred, the judicially noticed title records filed in support of the Buntzman Defendants' demurrer showed the property was never transferred to one of the Buntzman Defendants.

For Counts 11 and 12 (the Steinmetz Property), the court found Stillwater failed to state claims for actual and constructive fraudulent transfer because it alleged only that the property was transferred by an entity that was not a defendant in the Adversary Proceeding (Lady Lake Hotel, LLC) to an "unidentified" partner in a joint venture in which Rohan and Buntzman were involved. In other words, Stillwater failed to allege the property was transferred by one of the defendants in the Adversary Proceeding to one of the defendants named in this case.

As to Counts 13 (unjust enrichment), 14 (civil conspiracy), 15 (conspiracy to defraud), and 16 (aiding and abetting

conspiracy), the court granted Stillwater leave to amend those claims insofar as they arise out of the allegations that defendants obtained the Calhoun proceeds through fraudulent transfers. The court denied Stillwater leave to amend Count 17 (aiding and abetting breach of fiduciary duty) because it was not asserted in the original complaint and did not fall within the scope of the court's ruling allowing Stillwater to amend its original complaint. And the court denied Stillwater leave to amend Count 18 (constructive trust) because it could not allege it was ever entitled to possess any of the property or proceeds at issue in its lawsuit.

In November 2020, after Stillwater elected not to file a second amended complaint, the court entered judgment dismissing all of Stillwater's claims against the Buntzman Defendants. Stillwater appeals.

## DISCUSSION[6]

### 1. General Principles of Appellate Review

We independently review an order sustaining a demurrer to determine whether the operative complaint alleges facts sufficient to state a cause of action, liberally construing the complaint's allegations and assuming the truth of all properly pled facts and matters that are judicially noticeable. (*Ivanoff v. Bank of America, N.A.* (2017) 9 Cal.App.5th 719, 725*; Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 43, fn. 7.)

---

[6] We deny Stillwater's request for judicial notice of the reporter's transcript from an October 2018 hearing in a pending bankruptcy court case entitled, *Stillwater Liquidating, LLC v. Degma Investing, LLC, et al.*, case No. 2:18-ap-01220-BB.

19

That doesn't mean, however, that we must tackle issues or arguments that have not been meaningfully developed by the appealing party. Rather, our review of an order sustaining a demurrer " ' "is limited to issues which have been adequately raised and supported in [appellant's opening] brief." [Citations.]' " (*Foxen v. Carpenter* (2016) 6 Cal.App.5th 284, 290, fn. 2 (*Foxen*).) Accordingly, we will not consider arguments that, while only perfunctorily raised in an opening brief, are more fully developed in the appellant's reply brief unless the appellant demonstrates good cause for not developing the argument in its opening brief. (*Neighbours v. Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335, fn. 8 (*Neighbours*).)

These rules are derived from a cornerstone of appellate review: a judgment is presumed correct and will not be disturbed unless the appellant affirmatively shows the trial court committed reversible error. (Cal. Const., art. VI, § 13; *Dietz v. Meisenheimer & Herron* (2009) 177 Cal.App.4th 771, 799.) The appellant, therefore, "must present meaningful legal analysis supported by citations to authority and citations to facts in the record that support the claim of error." (*In re S.C.* (2006) 138 Cal.App.4th 396, 408.)

To that end, the appellant's opening brief must: (1) state each point raised under a separate heading; (2) support every factual assertion, including those in the brief's argument section, with accurate citations to the appellate record; and (3) support each point with cogent legal argument and, where possible, citation to pertinent legal authority. (Cal. Rules of Court, rule 8.204(a)(1).) If the appellant doesn't comply with these requirements, the reviewing court may disregard the appellant's claims of error as perfunctory. (See *Landry v. Berryessa Union*

20

*School Dist.* (1995) 39 Cal.App.4th 691, 699–700 (*Landry*) ["When an issue is unsupported by pertinent or cognizable legal argument it may be deemed abandoned and discussion by the reviewing court is unnecessary."]; see also *Princess Cruise Lines, Ltd. v. Superior Court* (2009) 179 Cal.App.4th 36, 45 (*Princess Cruise Lines*) [assertions in appellate brief not supported by references to the record may be disregarded].)

## 2.    Relevant Provisions of the Act

The Act protects creditors against fraudulent transfers of property made by their debtors. (*Mejia v. Reed* (2003) 31 Cal.4th 657, 664 (*Mejia*).) " 'A fraudulent conveyance is a transfer by the debtor of property to a third person undertaken with the intent to prevent a creditor from reaching that interest to satisfy its claim.' " (*Kirkeby v. Superior Court* (2004) 33 Cal.4th 642, 648.) Through the Act, a creditor may "reach property in the hands of a transferee," unless the transferee obtained the property in good faith and for a reasonably equivalent value. (*Mejia*, at p. 663; § 3439.08.)

Under the Act, a transfer may involve actual or constructive fraud. (*Mejia, supra*, 31 Cal.4th at p. 664.) A transfer involves actual fraud if it was made "with actual intent to hinder, delay, or defraud any creditor of the debtor." (§ 3439.04, subd. (a)(1).) A transfer involves constructive fraud if it was made without the debtor "receiving a reasonably equivalent value in exchange for the transfer or obligation" and: (1) "the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation" (§ 3439.05, subd. (a)); or (2) the debtor either "(A) [w]as engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business

21

transaction" or "(B) [i]ntended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due" (§ 3439.04, subd. (a)(2)).

Thus, to state a claim for actual or constructive fraudulent transfer against a transferee, a plaintiff must plead, at a minimum, that there was (1) a transfer of property from one of the plaintiff's debtors; (2) to the transferee, whether directly from the debtor or from an intermediate transferee of the debtor. (See 3439.08, subd. (b)(1); *Filip v. Bucurenciu* (2005) 129 Cal.App.4th 825, 829 (*Filip*).)

**3.    The court should have granted Stillwater leave to amend Count 3.**

Before addressing the numerous defects in Stillwater's opening brief, we address the single fraudulent transfer claim it has shown the court should have allowed it to amend—i.e., Count 3 for actual fraudulent transfer of the Sabal Storage property.

**3.1.   Relevant Background**

As we noted above, when it granted leave to amend the original complaint, the court directed Stillwater to plead facts showing the transferor of each property was either Rohan, Net Five Holdings, or another entity related to Net Five Holdings that was named as a defendant in the Adversary Proceeding.

In the first amended complaint, Stillwater alleged that in November 2013, only a few months before it filed the Adversary Proceeding, an entity named "Sabal Palm Ventures, L.L.C." transferred the Sabal Storage property to GMA and SDC. While GMA and SDC are defendants named in this case, Sabal Palm Ventures, L.L.C. was not a defendant named in the Adversary

22

Proceeding. Because Stillwater did not otherwise allege Rohan, Net Five Holdings, or any other defendant named in the Adversary Proceeding transferred the Sabal Storage property, or that the transferor of the property was threatened with litigation when the transfer was made, the court sustained the demurrer without leave to amend as to Count 3 (actual fraudulent transfer) and Count 4 (constructive fraudulent transfer).

But the court granted Stillwater's request for judicial notice of various title records, including those pertaining to the Sabal Storage property. While the Sabal Storage property records that Stillwater submitted largely overlapped with the records provided by the Buntzman Defendants, they included some deeds and affidavits that were not included in the Buntzman Defendants' request for judicial notice.

Most importantly, as Stillwater points out in its opening brief, Stillwater's records included a sworn affidavit signed and executed by Rohan on November 19, 2013, the same day the Sabal Storage property was transferred from Sabal Palm Ventures, L.L.C. to GMA and SDC. In the affidavit, which was later recorded in Florida, Rohan stated that a prior deed he signed in November 2008 purporting to transfer the Sabal Storage property to a "Sabal Ventures, L.L.C." was a nullity because such entity has never existed and the property was never conveyed to any entity by that name.

Stillwater's judicially noticed records also included a special warranty deed executed on November 19, 2013, in which Rohan "individually and d/b/a Sabal Ventures, L.L.C.," granted the Sabal Storage property to Sabal Palm Ventures, L.L.C. That same day, Sabal Palm Ventures, L.L.C. executed a deed transferring the Sabal Storage property to GMA and SDC. In

other words, the judicially noticed title records provided by Stillwater suggest that Rohan transferred the Sabal Storage property to another entity, Sabal Palm Ventures, L.L.C., immediately before the property was transferred to GMA and SDC, defendants named in this case. Although Stillwater relied on these records in opposing the demurrer to the first amended complaint, the court did not discuss them in its ruling on the demurrer.

### 3.2. Analysis

When ruling on a demurrer, the court is limited to considering the properly pleaded facts that appear on the face of the complaint, except it may consider those facts that are judicially noticeable. (*Howard Jarvis Taxpayers Assn. v. City of La Habra* (2001) 25 Cal.4th 809, 814.) Generally, that means the court may take judicial notice of the existence of a document, such as a contract, but not the truth of matters asserted in that contract. (*Ragland v. U.S. Bank National Assn.* (2012) 209 Cal.App.4th 182, 193.) An exception exists, however, for the contents of title records of real property, such as the fact that the property was transferred and the identities of the parties to the underlying transaction, because a "recorded deed is an official act of the executive branch." (*Id.* at p. 194.)

To be sure, Stillwater did not allege in the first amended complaint that a defendant named in the Adversary Proceeding was one of the transferors of the Sabal Storage property before it was transferred to one of the defendants named in this case. Nevertheless, when it ruled on the demurrer to that pleading, the court had before it judicially noticed documents showing that Stillwater could allege facts showing Rohan, a defendant named in the Adversary Proceeding, personally transferred the Sabal

24

Storage property to a third party immediately before it was transferred to GMA and SDC, defendants named in this case. Such a theory is consistent with the court's order granting Stillwater leave to amend the original complaint. (See § 3439.08, subd. (b)(1) [a creditor may pursue a claim under the Act against a subsequent transferee of the debtor's property].)

Because Stillwater could allege the Sabal Storage property was transferred with the intent to render Rohan, Net Five Holdings, and the other defendants named in the Adversary Proceeding judgment-proof (§ 3439.04, subd. (a)(1)), the court should have granted Stillwater leave to amend Count 3 for actual fraudulent transfer of the Sabal Storage property to state facts consistent with those contained in Stillwater's judicially noticed title records for that property.[7]

4.      **Stillwater has not met its burden on appeal to show how the court erred in sustaining the demurrer to the fraudulent transfer claims asserted in Counts 1 through 2 and 4 through 12 of the first amended complaint.**

Stillwater's opening brief does not fare as well with respect to the other fraudulent transfer claims asserted in the first amended complaint. As we explain, the 87-page brief is riddled with defects. The brief lacks cogent argument explaining how

---

[7] As we noted above, the court sustained the demurrer without leave to amend as to Count 4—i.e., constructive fraudulent transfer of the Sabal Storage property—finding it was time barred under section 3439.04, subdivision (b). We explain below why Stillwater hasn't met its burden on appeal to show the court erred in its application of the statute of limitations to Stillwater's constructive fraudulent transfer claims.

25

Stillwater pled, or could plead, facts sufficient to state any of its other fraudulent transfer claims or how Stillwater was prejudiced by many of the challenged rulings. While Stillwater more fully develops some of its arguments in its reply brief, we do not consider those arguments since Stillwater has not shown good cause why it couldn't develop them in its opening brief. (*Neighbours*, *supra*, 217 Cal.App.3d at p. 335, fn. 8; see also *People v. Baniqued* (2000) 85 Cal.App.4th 13, 29 [withholding a point or waiting to develop it until the reply brief is improper because it deprives the respondent of a meaningful opportunity to respond to it].)

### 4.1. The Court's Interpretation of Stillwater's Theory of the Case

As a preliminary matter, Stillwater asserts the court "misunderstood" its theory of the case when it limited Stillwater to pursuing claims arising out of transfers made when Rohan, Net Five Holdings, and the entities related to Net Five Holdings were subject to, or threatened with, litigation by Stillwater. According to Stillwater, the court's interpretation conflicts with the language of the Act, which identifies as a badge of actual fraud a transfer that was made after "the debtor had been sued or threatened with suit." (§ 3439.04, subd. (b)(4).) Stillwater claims the language "sued or threatened with suit" as used in section 3439.04, subdivision (b)(4) means a transfer may be fraudulent as to a plaintiff creditor if it is made during litigation that is brought, or while litigation is threatened, by *anyone*, even if those bringing or threatening suit when the transfer was made are not related to the plaintiff creditor. This argument is misguided.

When it opposed the original demurrer, Stillwater asserted its lawsuit was based on a theory that the Buntzman Defendants "took coordinated actions with [Buntzman's] long-time business partner—[Rohan]—to strip assets from entities Rohan controlled—the Net Five Entities—to render them judgment proof *while they and Rohan were defendants in a suit brought by Plaintiff.*" (Italics added and fn. omitted.) Stillwater made a similar representation later in its opposition, claiming, "It is incontrovertible that [Stillwater] is the [p]laintiff in [the] pending [Adversary Proceeding], *which was pending at the time of the transfers to*" the Buntzman Defendants. (Italics added.) When it sustained the original demurrer and granted Stillwater leave to file an amended complaint, the court relied on these representations, ordering Stillwater to replead its fraudulent transfer claims according to its "stated theory."

When a party, through its own representations, induces the court to take a particular course of action, that party may not later complain that the court erred in taking such action. (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 403 (*Norgart*) [" 'Where a party by his conduct induces the commission of error, he is estopped from asserting it as a ground for reversal' on appeal."].) Further, if the court sustains a demurrer with leave to amend, " 'the plaintiff may amend [its] complaint only as authorized by the court's order.' " (*Zakk v. Diesel* (2019) 33 Cal.App.5th 431, 456.) In other words, "the scope of the grant of leave is ordinarily a limited one. It gives the pleader an opportunity to cure the defects in the particular causes of action to which the demurrer was sustained, but that is all." (*Community Water Coalition v. Santa Cruz County Local Agency Formation Com.* (2011) 200 Cal.App.4th 1317, 1329.)

27

In light of the representations Stillwater made to induce the court to grant it leave to amend the original complaint and the scope of the court's order granting Stillwater that leave, Stillwater was limited to pleading its case under a theory "that the debtor who transferred the property to [the Buntzman] Defendants had been sued or threatened with suit by [Stillwater] at the time the transfer occurred." Stillwater cannot complain that the court erred in ordering it to plead its case in a manner consistent with Stillwater's own representations. (*Norgart*, *supra*, 21 Cal.4th at p. 403.)

In any event, Stillwater hasn't shown how it was prejudiced by the court's interpretation of the theory of its case. We will not reverse a judgment unless the appellant first shows how the purported error resulted in a miscarriage of justice. (Cal. Const., art. VI, § 13; *Century Surety Co. v. Polisso* (2006) 139 Cal.App.4th 922, 963 (*Century*) ["we cannot presume prejudice and will not reverse the judgment in the absence of an affirmative showing there was a miscarriage of justice"].) It is not sufficient for the appellant to assert an error was prejudicial without meaningful analysis. Rather, the appellant must spell "out in [its] brief exactly how the error caused a miscarriage of justice." (*Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106 (*Paterno*).)

Stillwater offers only a conclusory statement that it was prejudiced because the court's framing of the theory of its case "short-circuited" its ability to avoid and recover the "the three 2013 transfers." But Stillwater doesn't explain exactly how any of its claims were affected by the court's finding, let alone identify which causes of action involve the "three 2013 transfers." For instance, Stillwater doesn't claim that but for the court's framing of the theory of its case, Stillwater adequately pled, or could have

pled, any of its fraudulent transfer claims. Stillwater, therefore, hasn't shown how it was prejudiced by the court's framing of the theory of the case. (*Paterno*, *supra*, 74 Cal.App.4th at p. 106.)

### 4.2. Sufficiency of the Fraudulent Transfer Allegations

In the main argument section of its opening brief, Stillwater includes the following heading: "**The Court Erred In Finding [Stillwater] Failed to State Claims For Actual And Constructive Fraudulent Transfer**." The argument that accompanies this heading is about five pages long, in which Stillwater asserts, in a generalized manner, that the court erred in sustaining the demurrer to the first amended complaint because Stillwater pled sufficient facts to state each of its fraudulent transfer claims. Here is a summary of Stillwater's argument, with some excerpts to illustrate its deficiencies.

After briefly summarizing section 3439.04 of the Act, Stillwater asserts that "[o]verwhelming facts support [its] actual fraudulent transfer claims. Rohan/[Net Five Holdings], knowing that they were either in or facing litigation, in 2013 transferred the First Savannah Oaks, Sabal Storage Properties and the Calhoun Proceeds to Buntzman/Entities (including one in which Rohan maintained an interest) in the hopes of rendering themselves judgment proof and evading creditors. After the 'transfers,' Rohan and Buntzman together developed Savannah Oaks. In 2015, while parties in the Class Action and NY AP, Rohan/[Net Five Holdings] transferred four additional [p]roperties to Defendants. In response, Buntzman kicked back approximately $1,100,000 in cash to Rohan and staked Rohan in business deals worth $13,000,000. These transfers intentionally hindered and defrauded [Stillwater] and those for whom it acts,

in violation of §3439.04(a)(1)." Stillwater then includes a 19-line sentence listing the various "badges" of fraud it pled in the first amended complaint that show the transfers giving rise to this lawsuit were actually fraudulent.

Wrapping up this portion of its argument, Stillwater lists the alleged values for the various properties at issue in this lawsuit (without explaining when the properties were valued at such amounts), and states in conclusory fashion, "Because [Net Five Holdings] did not receive fair value for these transfers, they were also constructively fraudulent under [the Act]."

This argument is insufficient for a couple of reasons. First, Stillwater fails to engage in a meaningful analysis of any of its fraudulent transfer claims.

As we explained above, a plaintiff seeking to invalidate a transfer of property as fraudulent under the Act must plead, at a minimum, which property was transferred, which debtor made the transfer, and to which defendant the property was transferred. (See § 3439.08; *Filip*, *supra*, 129 Cal.App.4th at p. 829 [discussing the basic elements of a fraudulent transfer claim under the Act].) In its 23-page written ruling sustaining the demurrer to the first amended complaint, the court explained in detail how Stillwater failed to plead all of these elements as to each of its fraudulent transfer claims. Stillwater, however, fails to engage in such an analysis. It doesn't identify, as to each claim, which property forms the basis for the fraudulent transfer, which of its debtors allegedly transferred the property, and which defendant named in this case was the transferee of the property.

Indeed, Stillwater references by name only three of the properties at issue in this lawsuit, and it doesn't identify any of the individual defendants named in this case, aside from

30

Buntzman, even though none of its fraudulent transfer claims are based on a theory that Buntzman alone, or every Buntzman Defendant, was involved in the underlying transfer. In short, Stillwater's argument is woefully underdeveloped and conclusory. As such, we disregard it. (*Landry*, *supra*, 39 Cal.App.4th at pp. 699–700; see also *People v. Freeman* (1994) 8 Cal.4th 450, 482, fn. 2 [appellant abandoned claims of error that he only "perfunctorily" asserted "without development and … without a clear indication that they [were] intended to be discrete contentions"].)

The second defect is Stillwater's failure to cite to the record to support many of its factual assertions. Although Stillwater supports its 19-line list of the badges of fraud with a block of citations to the parts of the first amended complaint where those allegations appear, it does not provide any record citations to support its conclusory assertions that Rohan or Net Five Holdings transferred the underlying properties to the defendants in this case. That is, Stillwater doesn't point to where in the first amended complaint it pled which of Stillwater's debtors transferred each property at issue in this case to which of the six named defendants. Nor does Stillwater point to any of the exhibits or judicially noticed records where the facts supporting any of its fraudulent transfer claims appear. For that reason, Stillwater has forfeited this argument (*Princess Cruise Lines*, *supra*, 179 Cal.App.4th at p. 45 [assertions in appellate brief not supported by references to the record may be deemed forfeited].)

### 4.3.  The Alter Ego Doctrine

Stillwater next contends the court erred when it didn't find several of the alleged transferors named in the first amended complaint who were not defendants in the Adversary Proceeding

31

were "sham" or "shell" companies of Rohan and Net Five Holdings and, as such, should have been treated as their alter egos. This argument is not sufficiently developed.

To establish that a company is a defendant's alter ego, a plaintiff must allege facts showing: (1) there is "such a unity of interest and ownership between the corporation and its equitable owner that the separate personalities of the corporation and the shareholder do not in reality exist"; and (2) there would be "an inequitable result if the acts in question are treated as those of the corporation alone." (*Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 538 (*Sonora*).) " 'Among the factors to be considered in applying the [alter ego] doctrine are commingling of funds and other assets of the two entities, the holding out by one entity that it is liable for the debts of the other, identical equitable ownership in the two entities, use of the same offices and employees, and use of one as a mere shell or conduit for the affairs of the other.' [Citations.] Other factors which have been described in the case law include inadequate capitalization, disregard of corporate formalities, lack of segregation of corporate records, and identical directors and officers. [Citations.] No one characteristic governs, but the courts must look at all the circumstances to determine whether the doctrine should be applied. [Citation.] Alter ego is an extreme remedy, sparingly used." (*Id.* at pp. 538–539.)

Stillwater cites to only one paragraph in its first amended complaint to support its argument that it pled facts sufficient to warrant application of the alter ego doctrine to its fraudulent transfer claims. That paragraph states: "Once [Net Five Holdings] was formed, Rohan became its mastermind and created numerous Net Five Special Purpose Entities ('SPEs') (together

32

with [Net Five Holdings], the 'Net Five Entities') to which he then transferred assets contributed to [Net Five Holdings] as a means of capturing the financial benefit of these assets for himself and his co-conspirators. All [Net Five Holdings] assets, however, should have existed for the financial benefit of [Net Five Holdings'] members as a whole, including Gerova Financial."

This allegation does not establish the conditions for applying the alter ego doctrine. For instance, it doesn't identify any specific entity that was supposedly an alter ego of Rohan or Net Five Holdings. Nor does it address any of the factors used to determine whether an entity should be treated as an alter ego, such as which specific assets were comingled between any alleged alter egos and Net Five Holdings or Rohan. (*Sonora*, *supra*, 83 Cal.App.4th at pp. 538–539; see also *Leek v. Cooper* (2011) 194 Cal.App.4th 399, 415 ["An allegation that a person owns all of the corporate stock and makes all of the management decisions is insufficient to cause the court to disregard the corporate entity."].) It also doesn't allege as to each claim Stillwater contends the doctrine should apply which alter ego entity was involved in the underlying transfer or series of transfers.

In other parts of its argument, Stillwater makes only unsupported factual assertions that Rohan or Net Five Holdings used alter ego entities to transfer some of the properties. For example, Stillwater claims, "For the First Savannah Oaks Property, Rohan used a shell—[Net Five at Savannah Oaks], which, *until the day of the transfer*, was a defunct entity owned by [Net Five Holdings], which Rohan controlled. Rohan revived [Net Five at Savannah Oaks] only to facilitate that transfer to GMA (in which he has an interest). For the Second Savannah Oaks Property, Rohan used his shell—[Development Property

33

Holdings]—which he wholly-owned through yet another shell— DPHI. The Court wrote 'neither Net Five at Savannah Oaks, nor [Development Property Holdings] (the transferors of the Savannah Oaks Property) were named as defendants in the [Adversary Proceeding].' "

Stillwater doesn't support this argument with citations to where in the first amended complaint it alleged that Net Five at Savannah Oaks and Development Properties Holdings were alter egos of Rohan or Net Five Holdings. Nor does Stillwater cite to any of the exhibits attached to the first amended complaint or judicially noticed documents that would support these assertions. Instead, Stillwater cites to only a single page of the court's ruling on the demurrer to the first amended complaint, in which the court found that neither Net Five at Savannah Oaks nor Development Property Holdings was one of Stillwater's debtors. Needless to say, the court's ruling is not an allegation in a pleading or evidence establishing the facts of the claim that the court's ruling addresses.

It is not our responsibility to scour the more-than 4,000-page record, without Stillwater's assistance, to find facts and allegations that support Stillwater's claims of error. We therefore disregard Stillwater's contention that Net Five at Savannah Oaks and Development Property Holdings were alter egos of Rohan or Net Five Holdings. (*Princess Cruise Lines*, *supra*, 179 Cal.App.4th at p. 45 [assertions in appellate brief not supported by references to the record may be disregarded].)

In short, Stillwater hasn't developed any meaningful analysis demonstrating the court erred when it did not apply the alter ego doctrine in ruling on the demurrer to the first amended complaint. (*Landry, supra*, 39 Cal.App.4th at pp. 699–700.)

### 4.4. Title Records

Stillwater also contends the court erred when it relied on facts included in the Buntzman Defendants' judicially noticed title records that contradicted allegations in the first amended complaint. Aside from pointing out the discrepancies apparent in the title records for the Sabal Storage property that we discussed above, Stillwater hasn't developed this issue or shown how it was otherwise prejudiced by the court's reliance on any of the Buntzman Defendants' title records.

First, Stillwater argues the court erred when it relied on title records pertaining to the two sets of Savannah Oaks parcels. Stillwater asserts the title records don't reflect true ownership because Net Five Holdings never shows up in the properties' chain of title. This argument is forfeited because Stillwater doesn't support it with citations to the parts of the record where any of the title records it claims are inaccurate are located. (*Princess Cruise Lines*, *supra*, 179 Cal.App.4th at p. 45.)

In any event, as we explain in more detail later in this opinion, whether the court credited Stillwater's allegations that the Savannah Oaks parcels were once owned by Net Five Holdings is immaterial. Stillwater never alleged, nor does it assert it can allege, that Net Five Holdings, Rohan, or one of the defendants named in the Adversary Proceeding ever transferred the Savannah Oaks parcels. And, as we just explained above, to the extent Stillwater asserts the transferors of the Savannah Oaks parcels were Rohan's alter egos, Stillwater hasn't shown how it can plead facts supporting application of the alter ego doctrine to any of its causes of action. Thus, Stillwater hasn't established it can state a claim against the Buntzman Defendants for actual or constructive fraudulent transfer of the

Savannah Oaks parcels. (See § 3439.04, subd. (a) [to void a transfer, the plaintiff must establish it was made by one of its debtors].)

Second, Stillwater faults the court for assuming the title records for the Port, Tract F, and Steinmetz properties were accurate. This argument is also forfeited because Stillwater doesn't support it with citations to the numerous title records it claims are inaccurate. (*Princess Cruise Lines*, *supra*, 179 Cal.App.4th at p. 45.)

In any event, Stillwater can't show how it was harmed by the court's reliance on these title records. As to each property, Stillwater admitted in the first amended complaint that the property either was never transferred to one of the Buntzman Defendants or that it was unclear whether any of the underlying transfers were finalized. In other words, Stillwater never alleged that any of the defendants named in this case were the transferees of the Port, Tract F, or Steinmetz property. Nor has it shown it can allege such facts. In other words, Stillwater hasn't shown it can state claims against the Buntzman Defendants for actual or constructive fraudulent transfer of the Port, Tract F, and Steinmetz properties. (See § 3439.08 [a defendant must have been a transferee of property once owned by the plaintiff's debtor].)

### 4.5. Statute of Limitations for Constructive Fraudulent Transfer Claims

Stillwater contends the court misapplied the statute of limitations governing constructive fraudulent transfer claims.

As an initial matter, Stillwater's argument addresses only one of its constructive fraudulent claims that the court dismissed as time-barred—i.e., Count 2 for constructive fraudulent transfer

of one set of the Savannah Oaks parcels. We need not address Stillwater's statute of limitations argument as it relates to Count 2 because, as we've already explained, Stillwater hasn't otherwise shown it can plead the elements necessary to state a claim for constructive fraudulent transfer of any of the Savannah Oaks parcels. To the extent Stillwater purports to challenge the court's findings that the constructive fraudulent transfer claims asserted in Counts 4 and 6 of the first amended complaint were also time-barred, Stillwater hasn't developed any meaningful legal argument challenging those findings.

In any event, Stillwater's challenge to the court's interpretation of the statute of limitations for constructive fraudulent transfer claims is not well taken. Stillwater asserts the court "should have applied the discovery rule to toll the limitations period, as it did with actual fraudulent transfer claims."

Section 3439.09 establishes the limitations periods within which a plaintiff must bring actual and constructive fraudulent transfer claims under the Act. (*PGA West Residential Assn., Inc. v. Hulven Internat., Inc.* (2017) 14 Cal.App.5th 156, 179.) A claim for actual fraudulent transfer under section 3439.04, subdivision (a)(1) must be brought "not later than four years after the transfer was made or the obligation was incurred or, if later, not later than one year after the transfer or obligation was or could reasonably have been discovered by the claimant." (§ 3439.09, subd. (a).) A claim for constructive fraudulent transfer under section 3439.04, subdivision (a)(2) or section 3439.05 must be brought "not later than four years after the transfer was made or the obligation was incurred." (§ 3439.09, subd. (b).)

In finding some of Stillwater's constructive fraudulent transfer claims were time barred, the court analyzed the language of section 3439.09. Applying the *expressio unis est exclusio alterius* canon of statutory construction, the court found that the extended limitations period for delayed discovery of actual fraudulent transfer claims set forth in section 3439.09, subdivision (a) does not apply to constructive fraudulent transfer claims. Specifically, the court concluded that because section 3439.09 expressly extends the limitations period for delayed discovery of actual fraudulent transfer claims, while omitting such language from section 3439.09, subdivision (b), which establishes the limitations period for constructive fraudulent transfer claims, the Legislature clearly intended for the extended limitations period to apply only to actual fraudulent transfer claims brought under section 3439.04, subdivision (a)(1). (See *People v. Palacios* (2007) 41 Cal.4th 720, 732 (*Palacios*)[where exemptions are identified in one part of a statute, we may not apply them to other parts of the statute that do not provide for such exemptions "unless there is a clear legislative intent to the contrary"].)

As the court's ruling makes clear, whether an extended limitations period applies to a constructive fraudulent transfer claim is an issue of statutory interpretation. That is, to determine whether the extended limitations period for delayed discovery of a transfer applies to constructive fraudulent transfer claims, we must analyze the language and structure of section 3439.09. (See *Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 733 [analysis of statutory interpretation issues begins with the language of the statute].) But Stillwater never cites to section 3439.09 or discusses the language or structure of the statute to

38

support its argument that the court "should have applied the discovery rule to toll the limitations period, as it did with actual fraudulent transfer claims." Because it has not developed any meaningful legal analysis of section 3439.09's language, Stillwater has forfeited any challenge to the court's interpretation of that statute. (See *Foxen*, *supra*, 6 Cal.App.5th at p. 296 [plaintiff's failure to cite to the statute establishing the limitations period for one of her claims forfeited her challenge to the court's determination that the claim was barred by that limitations period].)

Regardless, Stillwater's argument fails on the merits. The language of section 3439.09 is clear. Unlike subdivision (a), which expressly applies to actual fraudulent transfer claims, subdivision (b) does not include any language extending the limitations period for a constructive fraudulent transfer claim to account for a plaintiff's delayed discovery of the underlying transfer. Aside from that difference, the two provisions each use identical language to establish a four-year limitations period for their respective class of claims. We may not imply, without clear legislative intent to the contrary, an exception to one part of statute, where that exception appears in another part of the statute (i.e., §3439.09, subdivision (a)) but not in the provision at issue (i.e., §3439.09, subdivision (b)). (*Palacios, supra,* 41 Cal.4th at p. 732.) Because Stillwater does not address the language of section 3439.09, let alone the Legislature's intent in enacting that statute, Stillwater has not shown why we should imply the extended limitations period identified in section 3439.09, subdivision (a) also applies to section 3439.09, subdivision (b).

Stillwater relies on *Cortez v. Vogt* (1997) 52 Cal.App.4th 917 (*Cortez*) to contend an extended limitations period also

39

applies to constructive fraudulent transfer claims. This reliance is misplaced.

In *Cortez*, the court held that in cases "where there is an alleged fraudulent transfer made during a pending lawsuit that will establish whether in fact, and the extent to which, a debtor-creditor relationship exists, … the limitation period [under section 3439.09] does not commence to run until the judgment in the underlying action becomes final." (*Cortez*, *supra*, 52 Cal.App.4th at p. 937.) That is not the issue here. Stillwater does not contend that the limitations period never began to run in this case or that the necessary creditor-debtor relationships for each of its constructive fraudulent transfer claims didn't exist until after the underlying transfers were made. Rather, it claims only that the extended limitations period for delayed discovery of an actual fraudulent transfer should also apply to constructive fraudulent transfers.

Undercutting Stillwater's argument even further, the court in *Cortez* explained that it was "unnecessary to discuss the one-year [extension] provision" set forth in section 3439.09, while noting that that provision only applies to claims governed by section 3439.09, subdivision (a)—i.e., claims for actual fraudulent transfer under section 3439.04, subdivision (a)(1). (*Cortez*, *supra*, 52 Cal.App.4th at p. 937; see also § 3439.09, subd. (a).) Stillwater doesn't address this part of the opinion in *Cortez*.

### 4.6. The Bankruptcy Court's Injunction

Next, Stillwater claims the court erred when it failed to consider a preliminary injunction issued by the bankruptcy court in the Adversary Proceeding.

Stillwater attached as an exhibit to its first amended complaint a copy of an injunction issued by the bankruptcy court

40

in the Adversary Proceeding in January 2015. The injunction precluded the Adversary Proceeding defendants from "selling, transferring, pledging or hypothecating any assets formerly belonging to or which can be traced to assets formerly belonging to, the Stillwater Funds, including, without limitation, the specific assets defined in the Motion as the Brandermill Escrow, the Winn Dixie Escrow, the Calhoun Track 2, the Life Policy and the Port Property, and the Kesef Properties." While its argument is convoluted and difficult to follow, Stillwater appears to claim the court in this case erred by failing to consider the injunction when it found Stillwater failed to state its claims for actual and constructive fraudulent transfers of the Port Property asserted in Counts 9 and 10 of the first amended complaint.

At the threshold, Stillwater has not shown the "Port Property" referenced in the bankruptcy court's injunction is the same property at issue in Counts 9 and 10 of the first amended complaint. Indeed, the record suggests the two properties are not the same. The injunction includes no information about where the "Port Property" is located, but it does state that the property was formerly owned by the Funds or could be traced to assets formerly owned by the Funds. In the first amended complaint, however, Stillwater repeatedly alleged that the Port Property giving rise to Counts 9 and 10 was first owned by Planet Five until Rohan pledged to contribute it to Net Five Holdings. The Port Property also appears in the first amended complaint's list of properties formerly owned by Planet Five. Stillwater does not point to anywhere in the first amended complaint where it ever alleged the Port Property at issue in Counts 9 and 10 was once owned by the Funds, nor does it point to anything else in the record to that effect.

41

In any event, regardless of whether the bankruptcy court's injunction encompassed the Port Property at issue in this case, the injunction's existence is not relevant as to why the court sustained the demurrer to Counts 9 and 10. The court sustained the demurrer to Counts 9 and 10 because Stillwater never alleged the Port Property was transferred to a defendant named in this case. Instead, Stillwater claimed only that beginning around April 2015, Rohan, Buntzman, and some of the other defendants named in this case participated in negotiations with other individuals and entities for the potential development of the Port Property. But Stillwater admitted in the first amended complaint that it was unclear whether any of the proposed transactions concerning the property ever went through. Because Stillwater hasn't demonstrated it can allege that one of the Buntzman Defendants was a transferee of the Port Property, the bankruptcy court's injunction is irrelevant to the claims asserted in this case. (See *Filip*, *supra*, 129 Cal.App.4th at p. 829 [to state a claim for fraudulent transfer under the Act, a plaintiff must allege the defendant was a transferee of property owned by the plaintiff's debtor].) Consequently, Stillwater hasn't shown the court erred by not considering the injunction when it ruled on the demurrer to the first amended complaint.

### 4.7. The Operating Agreement

Stillwater contends the court erred when it disregarded allegations in the first amended complaint that the Operating Agreement, by its terms alone, transferred ownership of the underlying properties to Net Five Holdings. This argument lacks merit.

It is immaterial whether the Operating Agreement purported to vest title to the underlying properties in Net Five

Holdings' name. As we discussed in the procedural background, Stillwater never alleged Net Five Holdings transferred any of the properties at issue, aside from the Calhoun property,[8] nor does it claim it can allege such facts. And, with the exception of the Sabal Storage property, Stillwater hasn't shown in its opening brief that it can allege that any of the defendants named in the Adversary Proceeding transferred the underlying properties— directly, indirectly, or through an alter ego—to one of the defendants named in this case. Thus, Stillwater cannot show what prejudice it suffered from the court disregarding the language in the Operating Agreement purporting to transfer ownership of the underlying properties to Net Five Holdings. (*Century*, *supra*, 139 Cal.App.4th at p. 963.)

### 4.8. Allegations Concerning Buntzman's Conspiracy with Rohan

Stillwater also asserts the court erred when it disregarded allegations in the first amended complaint and various exhibits showing Rohan and Buntzman had "conspired together and that Buntzman was intimately aware of Rohan's scheme." Stillwater makes no effort, however, to explain how these facts are relevant to any of the claims it asserted in the first amended complaint or how it was otherwise prejudiced by the court's apparent disregard of these facts. Because Stillwater has not developed this argument, we disregard it. (See *Landry*, *supra*, 39 Cal.App.4th at pp. 699–700 [court may disregard conclusory or

---

[8] Stillwater has not offered any arguments explaining why the court erred in sustaining the demurrer as to its fraudulent transfer claims concerning the Calhoun property—i.e., Counts 5 and 6 for actual and constructive fraudulent transfer of the Calhoun Proceeds.

perfunctory arguments included in the appellant's opening brief]; *Paterno, supra,* 74 Cal.App.4th at p. 106 [the appellant must show exactly how it was prejudiced by the court's purported error].)

## 5. The Common Law Claims

In its opening brief, Stillwater doesn't address whether the court erred in sustaining the demurrer without leave to amend its claim for aiding and abetting breach of fiduciary duty asserted in Count 17 of the first amended complaint. Likewise, Stillwater doesn't address the court's decision to sustain without leave to amend the demurrer to the constructive trust claim asserted in Count 18 on the grounds that Stillwater cannot assert it ever had a right to possess any of the properties at issue in this lawsuit. It has, therefore, waived any claims of error with respect to Counts 17 and 18. (See *Foxen, supra,* 6 Cal.App.5th at p. 290, fn. 2 [appellate court's review of an order sustaining a demurrer is limited to issues that have been raised and developed in the appellant's opening brief].)

As for Stillwater's other common law claims (Counts 13 through 16), the court found they rose and fell with Stillwater's fraudulent transfer claims because they were "premised" on the same theories. The court did not offer any independent grounds for sustaining the demurrer to these claims. To the extent Counts 13 through 16 arise out of facts common to Stillwater's claim for actual fraudulent transfer of the Sabal Storage property asserted in Count 3, the court should have granted Stillwater leave to amend those claims.

44

## 6. Stillwater has waived any right to amend its claims concerning the Calhoun Proceeds.

Finally, as we noted above in the procedural background, the court granted Stillwater leave to amend Count 5—i.e., constructive fraudulent transfer of the Calhoun Proceeds—and Counts 13, 14, 15, and 16 to the extent they arose out of the same facts as Count 5. Stillwater then filed a notice of election not to amend its first amended complaint, opting to stand on that pleading and asking the court to enter a final judgment of dismissal as to all its claims.

" ' "It is the rule that when a plaintiff is given the opportunity to amend [its] complaint and elects not to do so, strict construction of the complaint is required and it must be presumed that the plaintiff has stated as strong a case as [it] can." ' " (*Foxen, supra,* 6 Cal.App.5th at p. 296; *Le Mere v. Los Angeles Unified School Dist.* (2019) 35 Cal.App.5th 237, 244 [when an appellant declines the opportunity to amend its pleading, "[w]e must presume the FAC as pled is the strongest case appellant can make"].)

Stillwater offers no discernible arguments addressing why the court erred in sustaining the demurrer as to Count 5. Thus, by opting not to amend Counts 5, 13, 14, 15, and 16, Stillwater has conceded it cannot state facts to cure the defects in those claims as to the Calhoun Proceeds. (See *Las Lomas Land Co., LLC v. City of Los Angeles* (2009) 177 Cal.App.4th 837, 861 [by declining opportunity in the trial court to amend its complaint, plaintiff forfeited any right to request on appeal leave to file an amended complaint].) In other words, Stillwater has waived any right to amend Count 5, as well as Counts 13, 14, 15, and 16 to the extent they arise out of facts common to Count 5.

45

## DISPOSITION

The judgment of dismissal is affirmed in part, reversed in part, and the cause is remanded to the trial court with directions to vacate its order sustaining the demurrer to the first amended complaint. The court shall enter a new order sustaining the demurrer with leave to amend Count 3, and Counts 13, 14, 15, and 16 to the extent those claims arise out of the allegedly fraudulent transfer of the Sabal Storage property, and sustaining the demurrer without leave to amend as to the remaining counts. The parties shall bear their own costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

LAVIN, J.

WE CONCUR:


EDMON, P. J.


LIPNER, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.